<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                         
                 United States Court of Appeals
                     For the First Circuit

                      ____________________

No. 98-2304
                                
               NATIONAL FOREIGN TRADE COUNCIL,
                                
                      Plaintiff, Appellee,

                               v.

 ANDREW S. NATSIOS, in his official capacity as Secretary of
Administration and Finance of the Commonwealth of Massachusetts,
and PHILMORE ANDERSON, III, in his official capacity as State
   Purchasing Agent for the Commonwealth of Massachusetts,

                    Defendants, Appellants.

                                
                     ____________________
                                
         APPEAL FROM THE UNITED STATES DISTRICT COURT
                                
              FOR THE DISTRICT OF MASSACHUSETTS
                                
         [Hon. Joseph L. Tauro, U.S. District Judge]
                                
                     ____________________
                                
                            Before
                                
                    Lynch, Circuit Judge,
                                
            Coffin and Cyr, Senior Circuit Judges.
                     ____________________

    Thomas A. Barnico, Assistant Attorney General, with whom
Thomas F. Reilly, Attorney General, and James A. Sweeney, Assistant
Attorney General, were on brief, for appellants.
    Timothy B. Dyk, with whom Gregory A. Castanias, Jones, Day,
Reavis & Pogue, Michael A. Collora, and Dwyer & Collora were on
brief, for appellee.
    Jonathan P. Hiatt and Deborah Greenfield on brief for amicus
curiae American Federation of Labor and Congress of Industrial
Organizations.
    Loretta M. Smith, Cynthia L. Amara, and New England Legal
Foundation on brief for amici curiae Associated Industries of
Massachusetts and Retailers Association of Massachusetts.
    Zach Cowan, Acting City Attorney, and Christopher Alonzi,
Deputy City Attorney, on brief for amicus curiae City of Berkeley,
California.
    Martin S. Kaufman, Edwin L. Lewis, III, and Atlantic Legal
Foundation, Inc. on brief for amici curiae William E. Brock, Sam M.
Gibbons, Alexander M. Haig, Jr., Lee H. Hamilton, Carla A. Hills,
George P. Shultz, and Clayton Yeutter.
    Deborah E. Anker, Peter Rosenblum, Anusha Rasalingam, and
Harvard Law School Immigration and Refugee Clinic on brief for
amici curiae Center for Constitutional Rights, Citizens for
Participation in Political Action, The International Labor Rights
Fund, The New England Burma Roundtable, and The Unitarian
Universalist Service Committee.
    Daniel M. Price, Powell, Goldstein, Frazer & Murphy LLP, Robin
S. Conrad, National Chamber Litigation Center, Inc., Jan Amundson,
and Quentin Riegel on brief for amici curiae Chamber of Commerce of
the United States of America, Organization for International
Investment, National Association of Manufacturers, United States
Council for International Business, American Insurance Association,
American Petroleum Institute, and American Farm Bureau Federation.
    Sara C. Kay, Associate General Counsel, Office of the
Comptroller of the City of New York, on brief for amici curiae the
Comptroller of the City of New York, the Cities of Los Angeles,
California, Philadelphia, Pennsylvania, Oakland, California,
Boulder, Colorado, Santa Cruz, California, and Newton,
Massachusetts, the Towns of Amherst, Massachusetts and Carrboro,
North Carolina, the City and County of San Francisco, California,
and the County of Alameda, California.
    George A. Hall, Jr. and Anderson & Kreiger LLP on brief for
amici curiae Consumer's Choice Council, American Lands Alliance,
Preamble Center, Institute for Agriculture and Trade Policy,
Friends of the Earth, Humane Society of the United States,
Defenders of Wildlife, and Rainforest Relief.
    Richard L. Herz and Steven B. Herz on brief for amicus curiae  
EarthRights International.  
    Richard L.A. Weiner, David G. Leitch, Gil A. Abramson, and
Hogan & Hartson L.L.P. on brief for amici curiae The European
Communities and Their Member States.  
    Robert Stumberg, Matthew Porterfield, and Harrison Institute
for Public Law, Georgetown University Law Center on brief for amici
curiae Members of Congress Sen. Edward Kennedy, Rep. David Bonior,
Rep. Sherrod Brown, Rep. Michael Capuano, Rep. Peter DeFazio, Rep.
William Delahunt, Rep. Lane Evans, Rep. Barney Frank, Rep. Marcy
Kaptur, Rep. Dennis Kucinich, Rep. Edward Markey, Rep. James
McGovern, Rep. Martin Meehan, Rep. Joseph Moakley, Rep. George
Miller, Rep. Richard Neal, Rep. Robert Ney, Rep. John Olver, Rep.
Ileana Ros-Lehtinen, Rep. Bernard Sanders, Rep. Janice Schakowsky,
Rep. Christopher Smith, Rep. Ted Strickland, Rep. John Tierney,
Rep. James Traficant, and Rep. Henry Waxman.
    Charles Clark, W. Thomas McCraney, III, and Watkins & Eager,
PLLC on brief for amici curiae Members of Congress Sen. Richard G.
Lugar, Sen. Rod Grams, Sen. Craig Thomas, Sen. Pat Roberts, Rep.
Calvin Dooley, Rep. Donald Manzullo, Rep. Amory Houghton, Rep.
Michael G. Oxley, Rep. Doug Bereuter, and Rep. David Dreier.
    Heidi Heitkamp, Attorney General of North Dakota, Bill
Lockyer, Attorney General of California, J. Joseph Curran, Jr.,
Attorney General of Maryland, Philip T. McLaughlin, Attorney
General of New Hampshire, Patricia A. Madrid, Attorney General of
New Mexico, Eliot Spitzer, Attorney General of New York, John
Cornyn, Attorney General of Texas, Hardy Myers, Attorney General of
Oregon, and William H. Sorrell, Attorney General of Vermont, on
brief for amici curiae States of North Dakota, California, New
York, Texas, Oregon, New Mexico, New Hampshire, Vermont, and
Maryland.
    Daniel J. Popeo, R. Shawn Gunnarson, Evan Slavitt, and Gadsby
& Hannah LLP on brief for amici curiae The Washington Legal
Foundation, American Legislative Exchange Council, Rep. George N.
Katsakiores, Rep. Howard L. Fargo, and New York State Assemblyman
Clifford W. Crouch.
     
     
     
                     ____________________
                                
                        June 22, 1999
                     ____________________

 LYNCH, Circuit Judge.  The Commonwealth of Massachusetts
appeals from an injunction restraining enforcement of the
Massachusetts Burma Law, which restricts the ability of
Massachusetts and its agencies to purchase goods or services from
companies that do business with Burma.  We affirm the district
court's finding that the law interferes with the foreign affairs
power of the federal government and is thus unconstitutional.  We
also find that the Massachusetts Burma Law violates the Foreign
Commerce Clause.  We further find that the Massachusetts Burma Law
violates the Supremacy Clause because it is preempted by federal
sanctions against Burma.  We affirm the injunction issued by the
district court.
 There is one matter on which the parties are agreed:
human rights conditions in Burma are deplorable.  This case
requires no inquiry into these conditions.
                               I
1.  The Massachusetts Burma Law
 In 1996, Massachusetts enacted "An Act Regulating State
Contracts with Companies Doing Business with or in Burma
(Myanmar),"  ch. 130, 1996 Mass. Acts 239 (codified at Mass. Gen.
Laws ch. 7,  22G-22M, 40F (West Supp. 1998)) ("Massachusetts
Burma Law").  The law restricts the ability of Massachusetts and
its agencies and authorities to purchase goods or services from
individuals or companies that engage in business with Burma.  The
law requires the Secretary of Administration and Finance to
maintain a "restricted purchase list" of all firms engaged in
business with Burma.  Mass. Gen. Laws ch. 7,  22J.  As the
district court explained, companies may challenge inclusion on the
list by submitting an affidavit stating that they do no business
with Burma, but final determination as to whether a company is in
fact "doing business" as defined by the law is made by the
Executive Office's Operational Services Division.  See National
Foreign Trade Council v. Baker, 26 F. Supp. 2d 287, 289 (D. Mass.
1998).
 Under the law, Massachusetts and its agencies and
authorities may not contract with companies on the restricted
purchase list except in three situations: when procurement of the
bid is essential and there is no other bid or offer, when the
Commonwealth is purchasing certain medical supplies, or when there
is no "comparable low bid or offer."  Mass. Gen. Laws ch. 7,  22H.  
The law defines a "[c]omparable low bid or offer" as an offer equal
to or less than ten percent above a low bid from a company on the
restricted purchase list.  Id.  22G.  In practice, the law means
that in most cases a company on the restricted purchase list can
sell to Massachusetts only if the company's bid is for all
practical purposes ten percent lower than all bids by companies not
on the restricted purchase list.  Before a company can bid on a
Massachusetts contract, the law requires it to provide a sworn
declaration disclosing any business it is doing with Burma.  See
id.  22H.
  The law defines "doing business with Burma" to include:  
   (a) having a principal place of business, place of
 incorporation or . . . corporate headquarters in Burma
 (Myanmar) or having any operations, leases, franchises,
 majority-owned subsidiaries, distribution agreements, or
 any other similar agreements in Burma (Myanmar), or being
 the majority-owned subsidiary, licensee or franchise of
 such a person;
    
   (b) providing financial services to the government of
 Burma (Myanmar), including providing direct loans,
 underwriting government securities, providing any
 consulting advice or assistance, providing brokerage
 services, acting as a trustee or escrow agent, or
 otherwise acting as an agent pursuant to a contractual
 agreement;
    
   (c) promoting the importation or sale of gems, timber,
 oil, gas or other related products, commerce in which is
 largely controlled by the government of Burma (Myanmar),
 from Burma (Myanmar);
 
   (d) providing any goods or services to the government of
 Burma (Myanmar).

Id.  22G.
 The law allows exceptions for entities "with operations
in Burma (Myanmar) for the sole purpose of reporting the news, or
solely for the purpose of providing goods or services for the
provision of international telecommunications."  Id.  22H(e).  The
law also exempts firms whose business in Myanmar "is providing only
medical supplies."  Id.  22I.  The law does not impose any
explicit limits on the ability of private parties to engage in
business in Burma, or on the ability of private parties or local
governments to purchase products from firms engaged in business in
Burma.  It does, however, effectively force businesses to choose
between doing business in Burma or with Massachusetts.  
Massachusetts annually purchases more than $2 billion in goods and
services.
 The law does not include an express statement of purpose.  
In introducing the law to the legislature, the bill's sponsor, Rep.
Byron Rushing, stated that the law established a selective purchase
program because "if you're going to engage in foreign policy, you
have to be very specific."  Rep. Rushing also stated that the
"identifiable goal" of the law was "free democratic elections in
Burma."  In signing the bill, then-Lieutenant Governor Cellucci
stated that "[d]ue to a steady flow of foreign investments,
including those of some United States companies, [the] brutal
military regime [in Burma] has been able to supply itself with
weapons and portray itself as the legitimate government of Burma.  
Today is the day that we call their bluff."  Then-Governor Weld
commented that "[o]ne law passed by one state will not end the
suffering and oppression of the people of Burma, but it is my hope
that other states and the Congress will follow our example, and
make a stand for the cause of freedom and democracy around the
world."
 Massachusetts argued to the district court that the law
"expresses the Commonwealth's own disapproval of the violations of
human rights committed by the Burmese government" and "contributes
to the growing effort . . . to apply indirect economic pressure
against the Burma regime for reform."  Massachusetts also argued
that the law reflects "the historic concerns of the citizens of
Massachusetts" with supporting the rights "of people around the
world."  Massachusetts does not contend that the law is designed to
provide any economic benefit to Massachusetts.
 At the time the National Foreign Trade Council ("NFTC")
filed its complaint, there were 346 companies on the restricted
purchase list.  Forty-four of these companies were United States
companies.  The law has generated protests from a number of this
country's trading partners, including Japan, the European Union,
and the Association of Southeast Asian Nations ("ASEAN").  A number
of companies have withdrawn from Burma in recent years; at least
three cited the Massachusetts law as among the reasons for their
withdrawal.
 At least nineteen municipal governments have enacted
analogous laws restricting purchases from companies that do
business in Burma.  In addition, local jurisdictions have enacted
similar laws relating to China, Cuba, Nigeria, and other nations.
2.  Federal Sanctions Against Burma
 Congress imposed sanctions on Burma three months after
Massachusetts passed the Massachusetts Burma Law.  See Foreign
Operations, Export Financing, and Related Programs Appropriations
Act, 1997,  570, 110 Stat. 3009-166 to 3009-167 (enacted by the
Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208,
101(c), 110 Stat. 3009-121 to 3009-172 (1996)) ("Federal Burma
Law").  The federal law provides for sanctions to remain in place
"[u]ntil such time as the President determines and certifies to
Congress that Burma has made measurable and substantial progress in
improving human rights practices and implementing democratic
government."  Id.  570(a).  The federal legislation is divided
into five primary parts.  First, the statute bars any "United
States assistance to the Government of Burma," except for
humanitarian assistance, assistance for anti-narcotics efforts, or
"assistance promoting human rights and democratic values."  Id.
570(a)(1).  This first part of the statute also instructs the
Secretary of the Treasury to oppose any "loan or other utilization
of funds" by international financial institutions and bars most
Burmese officials from entering the United States unless required
by treaty.  Id.  570(a)(2), (3).  
 Second, the federal law authorizes the President to
impose conditional sanctions.  The law states:  
   The President is hereby authorized to prohibit, and shall
 prohibit United States persons from new investment in
 Burma, if the President determines and certifies to
 Congress that, after the date of enactment of this Act,
 the Government of Burma has physically harmed, rearrested
 for political acts, or exiled Daw Aung San Suu Kyi or has
 committed large-scale repression of or violence against
 the Democratic opposition.                                        

Id.  570(b).  The law defines "new investment" to include a range
of activity concerning "the economical development of resources
located in Burma."  Id.  570(f)(2).  However, "'new investment'
does not include the entry into, performance of, or financing of a
contract to sell or purchase goods, services, or technology."  Id.
 Third, the federal law instructs the President to work
with "members of ASEAN and other countries having major trading and
investment interests in Burma" to develop "a comprehensive,
multilateral strategy to bring democracy to and improve human
rights practices and the quality of life in Burma, including the
development of a dialogue between the State Law and Order
Restoration Council (SLORC) and democratic opposition groups within
Burma."  Id.  570(c).  Fourth, the law instructs the President to
report to Congress on conditions in Burma and on progress made in
furthering a multilateral strategy.  See id.  570(d).  Fifth, the
law grants the President the power to waive any of the sanctions if
"he determines and certifies to Congress that the application of
such sanction would be contrary to the national security interests
of the United States."  Id.  570(e).
 In May 1997, President Clinton issued an Executive Order
pursuant to the Federal Burma Law imposing trade sanctions on
Burma.  See Exec. Order No. 13,047, 62 Fed. Reg. 28,301 (1997); see
also 31 C.F.R. Pt. 537 (1998) (regulations implementing sanctions
authorized by the President's Executive Order).  The President
determined and certified that
   for purposes of section 570(b) of the [Federal Burma
 Law], the Government of Burma has committed large-scale
 repression of the democratic opposition in Burma . . .
 [and] the actions and policies of the Government of Burma
 constitute an unusual and extraordinary threat to the
 national security and foreign policy of the United
 States.

62 Fed. Reg. at 28,301.  The President declared "a national
emergency to deal with [the] threat."  Id.  The Executive Order
prohibited new investment, as defined by the Federal Burma Law, by
"United States persons" and prohibited United States persons from
approving or facilitating new investment in Burma by foreign
persons.  Id.  Like the Federal Burma Law, the Executive Order
explicitly exempts contracts "to sell or purchase goods, services,
or technology," provided such transactions are not to guarantee,
support, or make payments related to the development of resources
in Burma.  Id.  
3.  District Court Proceedings
 The NFTC, a nonprofit corporation representing member
companies that engage in foreign trade, filed suit on April 30,
1998, seeking declaratory and injunctive relief against two
Massachusetts officials.  The NFTC contended that the
Massachusetts Burma Law unconstitutionally interfered with the
federal foreign relations power, violated the Foreign Commerce
Clause, and was preempted by the Federal Burma Law.
 Thirty-four NFTC members are on Massachusetts's most
recent restricted purchase list.  Three NFTC members withdrew from
Burma after the passage of the Massachusetts law, citing the law as
the reason for their decision to cease doing business in Burma.  
One current NFTC member has had a bid for a procurement contract in
Massachusetts increased by ten percent pursuant to the law.
 The district court found that the Massachusetts Burma Law
unconstitutionally infringed on the foreign affairs power of the
federal government and thus granted declaratory and injunctive
relief.  See National Foreign Trade Council, 26 F. Supp. 2d at
289; National Foreign Trade Council v. Baker, No. 98-10757 (D.
Mass. Nov. 17, 1998) (order granting relief).  The court also found
that the NFTC had not met its burden of showing that the Federal
Burma Law preempted the Massachusetts Burma Law.  The district
court did not consider the NFTC's argument that the Massachusetts
law also violates the Foreign Commerce Clause.  See id. at 293.
4.  Standard of Review
 The district court ruled on cross-motions for summary
judgment, on stipulated facts and uncontested affidavits.  The
decision turned entirely on questions of law.  This court thus
reviews the district court's determinations de novo.  See Philip
Morris Inc. v. Harshbarger, 122 F.3d 58, 61-62 (1st Cir. 1997).
                               II
1.  The Foreign Affairs Power of the Federal Government
 We begin with a review of the Constitution's grant of
power over foreign affairs to the political branches of the federal
government.  The Constitution grants Congress the power "[t]o lay
and collect Taxes, Duties, Imposts and Excises, to pay the Debts
and provide for the common Defence and general Welfare of the
United States," U.S. Const. art. I,  8, cl. 1, "[t]o regulate
Commerce with foreign Nations," id. cl. 3, "[t]o establish an
uniform Rule of Naturalization," id. cl. 4, "[t]o define and punish
Piracies and Felonies committed on the high Seas, and Offences
against the Law of Nations," id. cl. 10, and "[t]o declare War,
grant Letters of Marque and Reprisal, and make Rules concerning
Captures on Land and Water," id. cl. 11.  In addition, "no Person
holding any Office of Profit or Trust under [the United States],
shall, without the Consent of the Congress, accept any present,
Emolument, Office, or Title, of any kind whatever, from any King,
Prince, or foreign State."  Id.  9, cl. 8.  Finally, "[t]he
Congress shall have Power to declare the Punishment of Treason."  
Id. art. III,  3, cl. 2.  
 The Constitution declares that the President shall be
Commander in Chief, id. art. II,  2, cl. 1, and, with the advice
and consent of the Senate, grants him the power "to make Treaties"
and to "appoint Ambassadors," id. cl. 2.  Additionally, the
President "shall receive Ambassadors and other public Ministers."  
Id.  3.
 The states are forbidden to "enter into any Treaty,
Alliance, or Confederation" or to "grant Letters of Marque and
Reprisal," id. art. I,  10, cl. 1, may not "without the Consent of
the Congress, lay any Imposts or Duties on Imports or Exports,
except what may be absolutely necessary for executing [their]
inspection Laws," id. cl. 2, and may not, "without the Consent of
Congress . . . enter into any Agreement or Compact with another
State, or with a foreign Power, or engage in War, unless actually
invaded, or in such imminent Danger as will not admit of delay,"
id. cl. 3.
 The Constitution's foreign affairs provisions have been
long understood to stand for the principle that power over foreign
affairs is vested exclusively in the federal government.  James
Madison commented that "[i]f we are to be one nation in any
respect, it clearly ought to be in respect to other nations."   The
Federalist No. 42, at 302 (James Madison) (B.F. Wright ed., Barnes
& Noble Books 1996); see also id. at 303 (noting that the Articles
of Confederation, by failing to contain any "provision for the case
of offences against the law of nations," left "it in the power of
any indiscreet member to embroil the Confederacy with foreign
nations").  Alexander Hamilton, discussing state regulation of
foreign commerce, noted that  
   [t]he interfering and unneighborly regulations of some
 States, contrary to the true spirit of the Union, have,
 in different instances, given just cause of umbrage and
 complaint to others, and it is to be feared that examples
 of this nature, if not restrained by a national control,
 would be multiplied and extended till they became not
 less serious sources of animosity and discord than
 injurious impediments to the intercourse between the
 different parts of the Confederacy.

Id. No. 22, at 192 (Alexander Hamilton); see also id. No. 45, at
328 (James Madison) (stating that "[t]he powers delegated by the
proposed Constitution to the federal government are few and
defined," and "will be exercised principally on external objects,
as war, peace, negotiation, and foreign commerce").  Justice Taney
echoed Madison's and Hamilton's views in Holmes v. Jennison, 39
U.S. (14 Pet.) 540 (1840), commenting that "[i]t was one of the
main objects of the Constitution to make us, so far as regarded our
foreign relations, one people, and one nation."  Id. at 575
(opinion of Taney, J.).
 Indeed, the Supreme Court has long held that "[p]ower
over external affairs is not shared by the States; it is vested in
the national government exclusively."  United States v. Pink, 315
U.S. 203, 233 (1942).  In The Chinese Exclusion Case, for example,
the Court commented that "[f]or local interests the several States
of the Union exist, but for national purposes, embracing our
relations with foreign nationals, we are but one people, one
nation, one power."  Chae Chan Ping v. United States, 130 U.S. 581,
606 (1889).  In Hines v. Davidowitz, 312 U.S. 52 (1941), the Court
stated that "[o]ur system of government is such that the interest
of the cities, counties and states, no less than the interest of
the people of the whole nation, imperatively requires that federal
power in the field affecting foreign relations be left entirely
free from local interference."  Id. at 63; see also United States
v. Belmont, 301 U.S. 324, 331 (1937) ("[I]n respect of our foreign
relations generally, state lines disappear.").  As the Court
explained in United States v. Curtiss-Wright Export Corp., 299 U.S.
304 (1936), when it comes to foreign affairs, the powers of the
federal government are not limited: "[t]he broad statement that the
federal government can exercise no powers except those specifically
enumerated in the Constitution, and such implied powers as are
necessary and proper to carry into effect the enumerated powers, is
categorically true only in respect of our internal affairs."  Id.
at 315-16 (emphasis added).  
 Federal dominion over foreign affairs does not mean that
there is no role for the states. A limited role is granted by the
Constitution, as discussed earlier.  See Restatement (Third) of
Foreign Relations Law of the United States  201 reporters' note 9
(commenting that "[u]nder the United States Constitution, a State
of the United States may make compacts or agreements with a foreign
power with the consent of Congress (Article I, Section 10, clause
2), but such agreements are limited in scope and subject matter"
and that "[a] State may make some agreements with foreign
governments without the consent of Congress so long as they do not
impinge upon the authority or the foreign relations of the United
States").  Indeed, Massachusetts itself maintains twenty-three
"sister state" and other bilateral agreements with sub-national
foreign governments and trade promotion organizations.  As one
learned commentator explains, some degree of state involvement in
foreign affairs is inevitable: "[i]n the governance of their
affairs, states have variously and inevitably impinged on U.S.
foreign relations."  L. Henkin, Foreign Affairs and the United
States Constitution 162 (2d ed. 1996).
 The central question is whether the state law runs afoul
of the federal foreign affairs power as interpreted by the Supreme
Court in Zschernig v. Miller, 389 U.S. 429 (1968), the case in
which the Supreme Court has most directly considered the boundaries
of permissible state activity in the foreign affairs context.
2.  The Decision in Zschernig
 In Zschernig, the Supreme Court invalidated an Oregon
statute that barred a non-resident alien from taking property by
testamentary disposition or succession unless he showed the
existence of three conditions: 1) "the existence of a reciprocal
right of a United States citizen to take property on the same terms
as a citizen or inhabitant of the [alien's] foreign country"; 2)
the right of United States citizens to "receive payment here of
funds from estates in the foreign country"; and 3) "the right of
the foreign heirs to receive the proceeds of Oregon estates
'without confiscation.'"  Id. at 430-31 (quoting Ore. Rev. Stat.  
111.070 (1957)).  If these requirements were not fulfilled and
there were no other heirs, the Oregon property would escheat to the
state.  In Zschernig, the sole heirs to the estate of an Oregon
resident who had died intestate in 1962 were residents of East
Germany, and thus Oregon's State Land Board had petitioned for the
escheat of the proceeds of the estate.  See id. at 430.  The Court
held that the statute was "an intrusion by [Oregon] into the field
of foreign affairs which the Constitution entrusts to the President
and the Congress."  Id. at 432.   
 The Zschernig Court distinguished the law at issue from
a similar California statute previously upheld in Clark v. Allen,
331 U.S. 503 (1947).  The California statute was upheld against a
facial challenge.  In contrast, the challenge to the Oregon statute
involved "the manner of its application."  Zschernig, 389 U.S. at
433.  The Supreme Court stated in Zschernig that "[h]ad [Clark]
appeared in the posture of the present [case], a different result
would have obtained."  Id.  As the Court explained, the problem
with the Oregon law was not that it required courts to inquire into
foreign law -- for "[s]tate courts, of course, must frequently
read, construe, and apply laws of foreign nations," id., but was
rather that probate courts had used the reciprocity requirement to
"launch[] inquiries into the type of governments that obtain in
particular foreign nations," id. at 434.  The Oregon statute had
"led into minute inquiries concerning the actual administration of
foreign law, into the credibility of foreign diplomatic statements,
and into speculation whether the fact that some received delivery
of funds should not preclude wonderment as to how many may have
been denied the right to receive."  Id. at 435 (internal quotation
marks omitted).  Such evaluations "affect[] international relations
in a persistent and subtle way," the Court found, and thus "may
well adversely affect the power of the central government to deal
with" problems of international relations.  Id. at 440-41.
 The district court found the Massachusetts Burma Law
invalid under Zschernig.  The court interpreted Zschernig to stand
for the proposition that "states and municipalities must yield to
the federal government when their actions affect significant issues
of foreign policy."  National Foreign Trade Council, 26 F. Supp. 2d
at 291.  The court stated that because the Massachusetts law "has
more than an 'indirect or incidental effect in foreign countries,'"
and has a "'great potential for disruption or embarrassment,'" it
unconstitutionally infringes on the federal government's foreign
affairs power.  Id. (quoting Zschernig, 389 U.S. at 434-35).  The
district court noted that the law was enacted solely to sanction
Burma so as to pressure the Burmese government to change its
domestic policies, and that the views of the European Union and
ASEAN demonstrated that the law was having a "disruptive impact on
foreign relations."  Id.
 The precise boundaries of the Supreme Court's holding in
Zschernig are unclear.  Nonetheless, we agree with the district
court that the Massachusetts Burma Law is unconstitutional under
Zschernig.  Because the parties' arguments raise issues of first
impression, we consider these arguments in detail.
 Massachusetts's arguments that the district court erred
can be divided into two lines of attack.  First, Massachusetts
attempts to distinguish the facts in Zschernig from the facts of
this case, and to argue that the Zschernig Court recognized the
need to balance state interests against possible harm resulting
from state intrusion in foreign affairs.  This balance, says
Massachusetts, weighs in favor of the Massachusetts law being found
constitutional.  Second, Massachusetts in effect argues that
Zschernig is weak precedent.  In particular, Massachusetts contends
that the Supreme Court's decision in Barclays Bank PLC v. Franchise
Tax Board, 512 U.S. 298 (1994), demonstrates that the Supreme
Court's holding in Zschernig is limited.  The NFTC, in turn,
contends that the Massachusetts Burma Law constitutes far greater
interference in foreign affairs than did the law under attack in
Zschernig, and argues that Massachusetts is in effect asking this
court to overrule Zschernig.
 First, Massachusetts attempts to distinguish Zschernig by
arguing that the Court struck down the Oregon law as applied, and
did not question the ability of states to enact laws that
indirectly affect foreign affairs.  Massachusetts argues that its
law does not entail nearly the degree of ongoing scrutiny or
criticism of foreign government action by the state that the Oregon
law entailed.  Massachusetts contends that Zschernig left intact
the holding in Clark, although the law there was also designed to
influence the behavior of foreign countries.  Indeed, Clark
expressly stated that the fact that a state law has "incidental or
indirect effect in foreign countries" does not make the law
invalid.  Clark, 331 U.S. at 517.  According to Massachusetts, the
district court incorrectly read Zschernig to stand for the
proposition that a state law that goes beyond an incidental or
indirect effect on foreign affairs is impermissible, and Zschernig
instead stands for the proposition that courts must weigh the
degree of impact against the particular state interest at issue.
 Massachusetts further argues that its law is concerned
with expressing its moral views regarding conditions in Burma, that
its desire to disassociate Massachusetts from Burma's human rights
violations is a valid purpose of the law, and that Massachusetts
would have enacted the law regardless of whether it believed that
the law would result in change in Burma.
 Massachusetts's arguments fail under Zschernig.  The
Massachusetts Burma Law clearly has more than an "incidental or
indirect effect in foreign countries."  We do not read Zschernig as
instructing courts to balance the nation's interests in a unified
foreign policy against the particular interests of an individual
state.  Instead, Zschernig stands for the principle that there is
a threshold level of involvement in and impact on foreign affairs
which the states may not exceed.  As Zschernig stated:
   The several States, of course, have traditionally
 regulated the descent and distribution of estates.  But
 those regulations must give way if they impair the
 effective exercise of the Nation's foreign policy.  Where
 those laws conflict with a treaty, they must bow to the
 superior federal policy.  Yet, even in absence of a
 treaty, a State's policy may disturb foreign relations.

Id. at 440-41 (emphasis added) (citations omitted).  Zschernig did
not hold, as Massachusetts argues, that a sufficiently strong state
interest could make lawful an otherwise impermissible intrusion
into the federal government's foreign affairs power.
 Massachusetts makes another preliminary argument which we
reject.  It attempts to distinguish the instant case from Zschernig
based on the level and frequency of scrutiny that the Massachusetts
law entails.  This argument is largely beside the point.  Further,
the argument fails even on its own terms.  It is beside the point
because the effect of the law is not measured solely by the level
or frequency of scrutiny.  Every decision by a company to withdraw
from or not seek new business in Burma has an ongoing impact every
bit as corrosive as scrutiny.  Massachusetts correctly notes that
its courts are not engaging in ongoing evaluations of the situation
in Burma; nor does the law permit or encourage such inquiries.  Yet
while the statute itself creates no mechanism for the Massachusetts
courts or legislature to evaluate conditions in Burma on an ongoing
basis, the law quite clearly establishes ongoing scrutiny.  The
Massachusetts law creates a mechanism for ongoing investigation
into whether companies are doing business with Burma: every time a
firm bids for a Massachusetts procurement contract, Massachusetts
inquires into whether that firm does business in Burma.  The
scrutiny involved here is not of human rights conditions alone.  By
investigating whether certain companies are doing business with
Burma, Massachusetts is evaluating developments abroad in a manner
akin to the Oregon probate courts in Zschernig.  
 The conclusion that the Massachusetts law has more than
an incidental or indirect effect on foreign relations is dictated
by the combination of factors present here: (1) the design and
intent of the law is to affect the affairs of a foreign country;
(2) Massachusetts, with its $2 billion in total annual purchasing
power by scores of state authorities and agencies, is in a position
to effectuate that design and intent and has had an effect; (3) the
effects of the law may well be magnified should Massachusetts  
prove to be a bellwether for other states (and other governments);
(4) the law has resulted in serious protests from other countries,
ASEAN, and the European Union; and (5) Massachusetts has chosen a
course divergent in at least five ways from the federal law, thus
raising the prospect of embarrassment for the country.
 Our discussion of the facts demonstrates the first two of
these factors; the fifth factor is discussed in our preemption
analysis later in this opinion.  We turn to the third and fourth
factors.  
 The threat to federal foreign affairs power is magnified
when Massachusetts is viewed as part of a broader pattern of state
and local intrusion.  Under Zschernig, the effect of state and
local laws should not be considered in isolation; rather, courts
must consider the combined effects of similar laws in numerous
jurisdictions.  In determining whether the Oregon law was likely to
have a significant effect on the nation's foreign affairs, the
Supreme Court noted that "[i]t now appears that in this reciprocity
area under inheritance statutes, the probate courts of various
States have launched inquiries into the type of governments that
obtain in particular foreign nations."  Id. at 433-34.  
Massachusetts is not alone in its views regarding Burma and there
is great potential for the proliferation of similar statutes.  Many
municipalities have passed laws akin to the Massachusetts Burma
Law, whether targeting Burma or some other country with disfavored
policies, and amici inform us that other states and large cities
are waiting in the wings.  This country has, we are told, 39,000
governments at levels other than the federal government, some
twenty of which have participated in the briefs amici curiae here.
 We also consider the protests received from this
country's allies and trading partners.  A European Union official
stated that the Massachusetts Burma Law is "an attack on
international law."  An ASEAN official commented that ASEAN is
"dismayed by this trend [of sub-national laws targeting Burma],
because you cannot negotiate with states and provinces."  We reject
Massachusetts's claim that we should ignore the fact that foreign
nations have objected to the Massachusetts Burma Law.  In
Zschernig, the Supreme Court expressly cited Bulgaria's objections
to the Oregon law as evidence of the fact that the law was
affecting foreign relations.  See id. at 436-37, 437 n.7.  The
Zschernig Court also noted the "great potential for disruption or
embarrassment" caused by the Oregon law.  Id. at 435.  The protests
of America's trading partners are evidence of the great potential
for disruption or embarrassment caused by the Massachusetts law.   
 Massachusetts points to two sources to support its claim
that, when examining whether a state or local law intrudes on the
federal government's foreign affairs power, United States courts
should simply ignore foreign government objections.  First,
Massachusetts notes that the federal law implementing the Uruguay
Round of the General Agreement on Tariffs and Trade (GATT) denies
foreign governments and private persons the right to challenge
state laws based on the GATT.  See Uruguay Round Agreements Act,
Pub. L. No. 103-465.  102, 108 Stat. 4809, 4815-19 (1994)
(codified at 19 U.S.C.  3512 (West Supp. 1999)).  Massachusetts
contends that, given this provision, objections from foreign states
to the Massachusetts law should not be considered.  This argument
is inapposite: this action has not been brought pursuant to the
GATT or any World Trade Organization agreement, and the NFTC does
not argue that the law should be invalidated because of a conflict
with any international trade agreement or treaty.
 Second, Massachusetts claims that Barclays rejected
reliance on the views of our trading partners.  We disagree with
Massachusetts's interpretation of Barclays.  Setting aside our
view, discussed further below, that Barclays does not apply outside
the context of Commerce Clause challenges to laws that do not
target specific foreign nations or foreign commerce, Barclays does
not stand for the proposition that courts should ignore foreign
government objections.  While the Supreme Court in Barclays found
foreign government views to be unpersuasive, it did not ignore such
views.  See Barclays, 512 U.S. at 324 n.22, 327-28.  The message of
Barclays is thus consistent with Zschernig: foreign government
views, although not dispositive, are one factor to consider in
determining whether a law impermissibly interferes with the federal
government's foreign affairs power.
 The preemption analysis later in this opinion outlines
the inconsistencies and conflicts between the Massachusetts Burma
Law and the Federal Burma Law.  The point for Zschernig purposes is
distinct.  The Massachusetts law presents a threat of embarrassment
to the country's conduct of foreign relations regarding Burma, and
in particular to the strategy that the Congress and the President
have chosen to exercise.  That significant potential for
embarrassment, together with the other factors listed above, drives
the conclusion that the Massachusetts Burma Law has more than an
"incidental or indirect effect" and so is an impermissible
intrusion into the foreign affairs power of the national
government.  
3.  Applications of Zschernig
 Our approach to this case is largely consistent with that
taken by the few other courts that have considered challenges to
state and local laws brought under Zschernig.  These cases have
generally fallen into two categories: challenges to the application
of laws targeting specific foreign states, most often South Africa,
and challenges to state "buy-American" laws.  
 In New York Times Co. v. City of New York Commission on
Human Rights, 361 N.E.2d 963 (N.Y. 1977), the court found that New
York could not apply local anti-discrimination laws to prohibit the
New York Times from carrying an advertisement for employment
opportunities in South Africa.  Under Zschernig, the court said
that "[e]ven longstanding state regulation of traditional fields of
law . . . must fall by the wayside if enforcement of State
regulations would 'impair the effective exercise of the Nation's
foreign policy.'"  Id. at 968 (quoting Zschernig, 389 U.S. at 440).  
Similarly, in Springfield Rare Coin Galleries, Inc. v. Johnson, 503
N.E.2d 300 (Ill. 1986), the Illinois Supreme Court invalidated a
state statute that had excluded South African coins from state tax
exemptions applying to coins and currency issued by all other
nations.  The court found that the "sole motivation [for the law]
was disapproval of a nation's policies" and that the legislation
effectively "impose[d], or at least encourage[d], an economic
boycott of the South African Krugerrand," and thus was "outside the
realm of permissible state activity."  Id. at 307; see also Tayyari
v. New Mexico State Univ., 495 F. Supp. 1365, 1376-80 (D.N.M. 1980)
(finding that a state university's decision to bar admission or
readmission of Iranian students could affect international
relations and thus was impermissible).
 In contrast, in Board of Trustees of the Employees'
Retirement System of Baltimore v.  Mayor and City Council of
Baltimore, 562 A.2d 720 (Md. 1989), cert. denied, 493 U.S. 1093
(1990), the Maryland Court of Appeals found that Baltimore
ordinances requiring city pension funds to divest their holdings
from companies engaged in business in South Africa were not
unconstitutional under Zschernig.  The court thought Zschernig
"circumscribes, but apparently does not eliminate, a state's
ability under certain circumstances to take actions involving
substantive judgments about foreign nations."  Id. at 746.  
Massachusetts relies heavily on the decision in Board of Trustees,
attempting to distinguish between Baltimore's decisions regarding
how to invest the city's funds and the laws struck down in New York
Times Co. and Springfield Rare Coin Galleries, Inc., which were
designed to regulate private conduct.  The district court correctly
distinguished Board of Trustees as involving quite different facts,
see National Foreign Trade Council, 26 F. Supp. 2d at 291-92, and
the NFTC urges this court to do the same.  Board of Trustees,
whether rightly or wrongly decided, does not alter our decision
that the Massachusetts Burma Law, by targeting a foreign country,
monitoring investment in that country, and attempting to limit
private interactions with that country, goes far beyond the limits
of permissible regulation under Zschernig.
 Courts have also split on whether state buy-American
statutes are unconstitutional under  Zschernig.  In Bethlehem Steel
Corp. v. Board of Commissioners, 80 Cal. Rptr. 800 (Ct. App. 2d
Dist. 1969), the court invalidated the California Buy American Act
as "an unconstitutional encroachment upon the federal government's
exclusive power over foreign affairs," id. at 802, and noted that
the fact that "there are countervailing state policies which are
served by the retention of such an Act is 'wholly irrelevant,'"  
id. at 803 (quoting Pink, 315 U.S. at  233).  In contrast, in
Trojan Technologies, Inc. v. Pennsylvania, 916 F.2d 903 (3d Cir.
1990), cert. denied, 501 U.S. 1212 (1991), and K.S.B. Technical
Sales Corp. v. North Jersey District Water Supply Commission, 381
A.2d 774 (N.J. 1977), courts upheld buy-American statutes at least
in part because such statutes did not require state governments to
evaluate the policies of foreign nations, and because the laws
treated all foreign states in the same fashion.  See Trojan Techs.,
916 F.2d at 913-914; K.S.B. Technical Sales Corp., 381 A.2d at 782-
84.  Thus, in Trojan Technologies, the Third Circuit upheld a
Pennsylvania buy-American statute because the law "provides no
opportunity for state administrative officials or judges to comment
on, let alone key their decisions to, the nature of foreign
regimes" and because there was no "indication from the record that
the statute [had] been selectively applied according to the foreign
policy attitudes of Commonwealth courts or the Commonwealth's
Attorney General."  Trojan Techs., 916 F.2d at 913.   
 As the district court correctly noted, see National
Foreign Trade Council, 26 F. Supp. 2d at 292, K.S.B. Technical
Sales Corp. and Trojan Technologies both involved laws that did not
single out or evaluate any particular foreign state, and did not
involve state evaluations of political conditions abroad.  In
contrast, the Massachusetts Burma Law is aimed at a specific
foreign state and has more than incidental effects.
4.  Subsequent Supreme Court Decisions and Zschernig
 Massachusetts's second line of attack against the
district court's ruling is that Supreme Court decisions subsequent
to Zschernig, in particular the Barclays decision, demonstrate that
Zschernig is so limited as not to invalidate the statute.  
Massachusetts relies on both the language of Barclays and on the
views of some academic commentators to argue that Zschernig is or
should be treated as a highly limited holding.
 a.  Subsequent Supreme Court References to Zschernig
 Zschernig remains "[t]he only case in which the Supreme
Court has struck down a state statute as violative of the foreign
affairs power" of the federal government.  International Ass'n of
Indep. Tanker Owners v. Locke, 148 F.3d 1053, 1069 (9th Cir. 1998),
petition for cert. filed, 67 U.S.L.W. 3671 (U.S. Apr. 23, 1999)
(No. 98-1706).  Subsequent Supreme Court decisions have done little
to clarify the reach of the Court's holding in Zschernig.  Most
often the Court has cited the case for the proposition that the
federal government's powers over foreign affairs are plenary, or
for the proposition that cases in United States courts that involve
foreign sovereigns raise sensitive issues of foreign affairs.  See,
e.g., Hillsborough County v. Automated Med. Lab., Inc., 471 U.S.
707, 719 (1985); Verlinden B.V. v. Central Bank of Nigeria, 461
U.S. 480, 493 (1983) ("Actions against foreign sovereigns in our
courts raise sensitive issues concerning the foreign relations of
the United States, and the primacy of federal concerns is
evident."); see also Dennis v. Higgins, 498 U.S. 439, 463 (1991)
(Kennedy, J., dissenting).  In First National City Bank v. Banco
Nacional de Cuba, 406 U.S. 759 (1972), involving the application of
the act of state doctrine, the plurality distinguished Zschernig by
noting that in Zschernig "the Court struck down an Oregon statute
that was held to be 'an intrusion by the State into the field of
foreign affairs which the Constitution entrusts to the President
and the Congress.'"  Id. at 765 (plurality opinion of Rehnquist,
J.) (quoting Zschernig, 389 U.S. at 432).  No decision by the Court
citing Zschernig suggests that it is not binding.
 b.  The Effect of Barclays
 Massachusetts argues that this court should nonetheless
look to Barclays.  Barclays, however, did not consider the reach of
the foreign affairs power and did not cite Zschernig.  See
Barclays, 512 U.S. at 301-31.  
 In Barclays, the Court upheld California's corporate tax
system against Commerce Clause and due process challenges to its
worldwide combined reporting requirement.  Petitioner Barclays had
argued that the system burdened foreign-based multinationals;
Barclays had also argued that the law impeded the federal
government's ability to "speak with one voice when regulating
commercial relations with foreign governments."  Id. at 302-03
(quoting Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434,
449 (1979)) (internal quotation marks omitted).   
 The Barclays Court reaffirmed that, in addition to the
ordinary domestic commerce clause analysis set forth in Complete
Auto Transit, Inc. v. Brady, 430 U.S. 274, 279 (1977), state
regulation of foreign commerce raises two additional concerns:
first, an "enhanced risk of multiple taxation," Barclays, 512 U.S.
at 311 (quoting Container Corp. of Am. v. Franchise Tax Bd., 463
U.S. 159, 185 (1983)) (internal quotation marks omitted), and
second, the risk of harm to the "Federal Government's capacity to
speak with one voice when regulating commercial relations with
foreign governments," id.  (quoting Japan Line, 441 U.S. at 449)
(internal quotation marks omitted).  In the absence of a
congressional or presidential assertion that the challenged
California law violated federal policy, however, the Court could
not "conclude that 'the foreign policy of the United States --
whose nuances . . . are much more the province of the Executive
Branch and Congress than of this Court -- is [so] seriously
threatened' by California's practice as to warrant our
intervention."  Barclays, 512 U.S. at 327 (alteration in original)
(citation omitted) (quoting Container Corp., 463 U.S. at 196).  
 Barclays also reaffirmed that recognition of the
importance of the federal government's ability to speak with one
voice on foreign affairs does not mean that Congress must act, or
that the states can never act, in a particular area.  See id. at
329.  As the Court commented in Wardair Canada Inc. v. Florida
Department of Revenue, 477 U.S. 1 (1986), where it similarly found
that a state tax law did not impede the ability of the federal
government to speak with one voice,
   [b]y negative implication . . . the United States has at
 least acquiesced in state taxation of fuel used by
 foreign carriers in international travel. . . . [T]he
 Federal Government is entitled in its wisdom to act to
 permit the States varying degrees of regulatory
 authority.
     . . . [W]e never suggested in [Japan Line] or in
 any other [case] that the Foreign Commerce Clause insists
 that the Federal Government speak with any particular
 voice.

Id. at 12-13 (emphasis in original).
 Massachusetts contends that Barclays means that only
Congress, not the courts, should ever determine whether a state law
interferes with the foreign affairs power of the federal
government.  This argument echoes academic debate over whether
Barclays undercuts Zschernig or not.  
 Scholarly debate about the continuing viability of a
Supreme Court opinion does not, of course, excuse the lower federal
courts from applying that opinion.  We need not delve into the
merits of the academic debate over Barclays in order to resolve
this case.  We do not view Barclays as having the impact in the
foreign affairs power analysis that Massachusetts contends it has,
for at least two reasons.  First, Barclays did not involve a state
law that targeted any foreign nation or nations, and there was no
claim in the case that California was engaging in foreign policy
via its tax system; the case involved claims only that the
California law violated the Commerce and Due Process clauses.  See
Barclays, 512 U.S. at 302-03.  The Court's discussion of
congressional inaction came only in the context of an examination
of the "speak with one voice" prong of the Foreign Commerce Clause
analysis, a prong that the court reached only after concluding that
the law was not otherwise unconstitutional.  See id. at 320-30.  In
contrast, the present case involves a law impacting one foreign
nation, and a claim that the Massachusetts law violates the foreign
affairs power of the federal government.  Second, the Supreme Court
did not cite to Zschernig in Barclays, thus keeping separate the
analyses that apply when examining laws under the Foreign Commerce
Clause and under the foreign affairs power.  This is particularly
so given that the parties in Barclays cited Zschernig to the Court
in their briefs and at oral argument.  In sum, there is simply no
indication, in Barclays or in any other post-Zschernig case, that
Zschernig is not good law and is not binding on us.  As this court
explained in Figueroa v. Rivera, 147 F.3d 77 (1st Cir. 1998), the
Supreme Court "has admonished the lower federal courts to follow
its directly applicable precedent, even if that precedent appears
weakened by pronouncements in its subsequent decisions, and to
leave to the Court 'the prerogative of overruling its own
decisions.'"  Id. at 81 n.3 (quoting Agostini v. Felton, 521 U.S.
203, 237 (1997)).
5.  Additional Arguments Regarding the Foreign Affairs Power
   a.  There is No Market Participant Exception to the
             Foreign Affairs Power

  Massachusetts suggests that, even if its interpretation
of Barclays and Zschernig is incorrect, the Massachusetts Burma Law
can be upheld by applying a market participant exception.  This is
a novel argument.  Massachusetts contends that the market
participant exception to the dormant domestic Commerce Clause
should be extended both to the Foreign Commerce Clause -- an
extension that the Supreme Court has never made -- and from there
to the foreign affairs power.  Even assuming that Massachusetts is
acting as a market participant (and not exercising its police or
regulatory powers) and that the market participant exception
applies to the Foreign Commerce Clause, we find no support for
Massachusetts's contention that the exception should shield its law
from challenges brought under the federal foreign affairs power as
interpreted in Zschernig.   
 Massachusetts provides little support for its argument,
citing no case which has ever accepted it.  Massachusetts contends
that in The Federalist the Framers were concerned with state
regulatory action that infringed on foreign affairs, not state
proprietary action.  The same rationales that support the market
participant exception in dormant domestic Commerce Clause
jurisprudence, Massachusetts insists, support extension of the
exception to claims under the foreign affairs power.
 Massachusetts also relies on a 1986 Department of Justice
advisory opinion concerning the constitutionality of state and
local statutes regarding divestment from South Africa.  See 10 Op.
Off. Legal Counsel 49 (1986).  The opinion argues that "[t]he
historical rationale for the general federal power over foreign
affairs does not imply the displacement of state proprietary
power," and that "[b]ecause states . . . possessed proprietary
powers at the time of the Constitution, these powers should not be
displaced unless they are prohibited by a specific limitation
imposed by the Constitution or federal legislation passed pursuant
to a constitutional grant of power to the federal government."  Id.
at 63-64.  This view directly contradicts the Supreme Court's
repeated statements that the federal government's foreign affairs
power is not limited.  Zschernig makes clear that, by necessary
implication, the federal government's foreign affairs power exceeds
the power expressly granted in the text of the Constitution, and
that state action, even in traditional areas of state concern, must
yield to the federal power when such state action has more than an
indirect effect on the nation's own foreign policy.  Nothing in
Zschernig or in the Supreme Court's market participant caselaw
supports Massachusetts's argument.  The Supreme Court has already
rejected one attempt to extend the market participation doctrine to
constitutional provisions other than the domestic Commerce Clause.  
See United Bldg. & Constr. Trades Council v. Mayor & Council of
Camden, 465 U.S. 208, 219-20 (1984) (stating that the "distinction
between market participant and market regulator relied upon in
[domestic Commerce Clause caselaw] to dispose of the Commerce
Clause challenge is not dispositive" of a claim brought under the
Privileges and Immunities Clause, because "[t]he two Clauses have
different aims and set different standards for state conduct").    
 b. The Tenth Amendment Does Not Insulate the
             Massachusetts Burma Law from Constitutional Scrutiny

 Massachusetts also suggests in passing that its law
should be protected by the Tenth Amendment, or that the Tenth
Amendment, at the least, indicates that strong state interests are
at stake here.  To the extent that Massachusetts intended to assert
a direct Tenth Amendment claim, that claim is waived.  It would
not suffice in any event.  Massachusetts suggests that the Tenth
Amendment prevents the courts and Congress from imposing regulatory
burdens on the states that are not borne by private persons, and
that states cannot be compelled to administer a federal regulatory
program.  Cf. Printz v. United States, 117 S. Ct. 2365, 2384
(1997); New York v. United States, 505 U.S. 144, 178-80 (1992).  
Massachusetts argues that the effect of the district court decision
is to compel Massachusetts to engage in commerce with members of
the NFTC.  These arguments miss their mark: even if Massachusetts
were being compelled to deal with firms that do business in Burma,
such compulsion is not similar to the federal government compulsion
of states found impermissible in New York and Printz.
 Massachusetts also contends that a state's purchasing
decisions "lie[] at the core of state sovereignty" and thus fall
within the area protected by the Tenth Amendment, and that the
Massachusetts law is an "expression of a moral position on an
important issue of public policy."  We do not view these arguments
as distinct from Massachusetts's claim that the law reflects
important state interests that, under Zschernig, must be balanced
against the federal government's foreign affairs power.  Even where
they exist, strong state interests do not make an otherwise
unconstitutional law constitutional.
   c.  The Massachusetts Burma Law is Not Shielded by the   
     First Amendment

 Massachusetts also argues that, regardless of the effect
of Zschernig on the Massachusetts Burma Law, the law is protected
by the First Amendment.  At oral argument, Massachusetts stated
that it is not actually contending that the First Amendment
protects its law or that the Commonwealth has First Amendment
rights.  Instead, Massachusetts argues that First Amendment values
should weigh in favor of a finding that Massachusetts has
significant interests at stake here, interests that should be
considered under Zschernig.  Although a few district courts in
other circuits have found that local governments do have First
Amendment rights, see, e.g., County of Suffolk v. Long Island
Lighting Co., 710 F. Supp. 1387, 1390 (E.D.N.Y. 1989), aff'd, 907
F.2d 1295 (2d Cir. 1990), the First Circuit has expressed doubt,
holding that a legal services office of a state university lacks
such rights and saying that "a state entity[] itself has no First
Amendment rights," Student Gov't Ass'n v. Board of Trustees, 868
F.2d 473, 481 (1st Cir. 1989).  Nothing in Zschernig suggests that
a state government's First Amendment interests, if any, should
weigh into a consideration of whether a state has impermissibly
interfered with the federal government's foreign affairs power.
                              III
 The foreign affairs power is, of course, not the only
aspect of the Constitution at work in the foreign affairs arena.  
In addition to the foreign affairs power, the Commerce Clause
grants Congress the power "[t]o regulate Commerce with foreign
Nations, and among the several States."  U.S. Const. art. I,  8,
cl. 3.  "It has long been understood, as well, to provide
'protection from state legislation inimical to the national
commerce [even] where Congress has not acted . . . .'"  Barclays,
512 U.S. at 310 (alterations in original) (quoting Southern Pac.
Co. v. Arizona ex rel. Sullivan, 325 U.S. 761, 769 (1945)).  The
NFTC argues that, regardless of whether the Massachusetts Burma Law
violates the foreign affairs power, the law violates the dormant
Commerce Clause.  Massachusetts responds that it is a market
participant, and that the market participant exception that the
Supreme Court has recognized in its dormant domestic Commerce
Clause analysis should be applied to the Foreign Commerce Clause.  
Even if the exception does not apply, Massachusetts further
contends, the law still does not violate the Foreign Commerce
Clause.  The district court did not reach these arguments.  See
National Foreign Trade Council, 26 F. Supp. 2d at 293.   
 We examine these claims in three stages.  First, applying
dormant domestic Commerce Clause caselaw, we find that
Massachusetts is not a market participant when it acts pursuant to
the Massachusetts Burma Law.  Second, we examine whether, in any
event, the market participant exception should be extended to the
Foreign Commerce Clause.  Third, we find that the Massachusetts law
violates the Foreign Commerce Clause.  
1.  Massachusetts is Not Acting as a Market Participant
 Massachusetts says that it is exempt from any Foreign
Commerce Clause scrutiny because it is a market participant and not
a market regulator.  Massachusetts relies on the Supreme Court's
domestic Commerce Clause decisions in White v. Massachusetts
Council of Construction Employers, Inc., 460 U.S. 204 (1983),
Reeves, Inc. v. Stake, 447 U.S. 429 (1980), and Hughes v.
Alexandria Scrap Corp., 426 U.S. 794 (1976).  These cases establish
that "if a State is acting as a market participant, rather than as
a market regulator, the dormant Commerce Clause places no
limitation on its activities."  South-Central Timber Dev., Inc. v.
Wunnicke, 467 U.S. 82, 93 (1984) (plurality opinion of White, J.);
see also White, 460 U.S. at 214-15; Reeves, 447 U.S. at 436-37;
Alexandria Scrap, 426 U.S. at 810.  We will assume arguendo that
there is a market participant exception under the Foreign Commerce
Clause and test whether Massachusetts is acting as a market
participant or as a market regulator.
 Even applying domestic market participant doctrine in
this context, we hold that Massachusetts has not acted as a mere
market participant.  The Supreme Court first recognized the
domestic market participant exception in Alexandria Scrap,
upholding a Maryland law that imposed extra documentation
requirements on out-of-state processors of scrap metal who sought
to receive bounties from the state for converting junk cars into
scrap.  See Alexandria Scrap, 426 U.S. at 800-01, 814.  In Reeves,
the Court upheld South Dakota's decision to sell cement from a
state-owned plant only to state residents during a cement shortage.  
See Reeves, 447 U.S. at 432-34, 446-47.  The cases bearing most
directly on the issue here are the Supreme Court's subsequent
decisions in White, South-Central Timber, and Camps
Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564 (1997).
 In White, the Supreme Court upheld against a domestic
Commerce Clause challenge a mayoral order that required at least
half of the workforce to be Boston residents on projects funded
partially or entirely by Boston city funds.  The Court commented
that there was no evidence that the executive order in question was
an "'attempt to force virtually all businesses that benefit in some
way from the economic ripple effect' of the city's decision to
enter into contracts for construction projects 'to bias their
employment practices in favor of the [city's] residents.'"  White,
460 U.S. at 211 (alteration in original) (quoting Hicklin v.
Orbeck, 437 U.S. 518, 531 (1978)).  
 In South-Central Timber, the Supreme Court held that the
domestic market participant doctrine has limits.  The Court held
that the state of Alaska, as a seller of timber, could not require
that timber from state lands be processed within the state before
being exported, and said that the market participant doctrine does
not permit a state to impose extensive conditions on firms with
which the state does business: "Although the Court in Reeves did
strongly endorse the right of a State to deal with whomever it
chooses when it participates in the market, it did not -- and did
not purport to -- sanction the imposition of any terms that the
State might desire."  South-Central Timber, 467 U.S. at 95-96
(plurality opinion of White, J.).  The plurality added that the
"doctrine is not carte blanche to impose any conditions that the
State has the economic power to dictate, and does not validate any
requirement merely because the State imposes it upon someone with
whom it is in contractual privity."  Id. at 97.  The plurality
noted that Alaska was not just participating in the market, for
"the seller usually has no say over, and no interest in, how the
product is to be used after sale," id. at 96, and that "[u]nless
the 'market' [in the market participation doctrine] is relatively
narrowly defined, the doctrine has the potential of swallowing up
the rule that States may not impose substantial burdens on
interstate commerce even if they act with the permissible state
purpose of fostering local industry," id. at 97-98.  "In sum, the
State may not avail itself of the market-participant doctrine to
immunize its downstream regulation of [a] market in which it is not
a participant."  Id. at 99.
 More recently, in Camps Newfound/Owatonna, the Court
again rejected an attempt to use the market participant exception
to shield state conduct from domestic Commerce Clause scrutiny.  
The Court said that the market participant exception is a narrow
one, noting that Reeves and Alexandria Scrap both involved "a
discrete activity focused on a single industry."  Camps
Newfound/Owatonna, Inc., 520 U.S. at 594.  The Court invalidated a
Maine statute that granted more limited tax benefits to non-profit
organizations largely serving non-residents than to organizations
primarily serving Maine residents.  See id. at 567-69, 594-95.  The
Court warned against an expansion of the market participant
exception that "would swallow the rule against discriminatory tax
schemes."  Id. at 594.  Maine's tax exemption, it said, "must be
viewed as action taken in the State's sovereign capacity rather
than a proprietary decision to make an entry into all of the
markets in which the exempted charities function."  Id.
 We find that in enacting the Massachusetts Burma Law the
Commonwealth has crossed over the line from market participant to
market regulator.  Massachusetts contends that its law is akin to
the Boston order upheld in White.  But White involved an attempt to
dictate the employment of Boston residents in projects funded by
the city; it did not involve an attempt by Boston to require all
contractors with the city to employ Boston residents in all of
their other projects, a situation more akin to this case.  Here,
Massachusetts is attempting to impose on companies with which it
does business conditions that apply to activities not even remotely
connected to such companies' interactions with Massachusetts.
 Massachusetts attempts to distinguish its law from the
controlling Supreme Court precedent.  Massachusetts notes that
South-Central Timber involved an attempt to impose a downstream
restriction on timber.  Indeed, the Alaska regulation there at
issue imposed a "restriction on private economic activity [that
took] place after the completion of the parties' direct commercial
obligations, rather than during the course of an ongoing commercial
relationship in which the [state actor] retained a continuing
proprietary interest in the subject of the contract."  South-
Central Timber, 467 U.S. at 99 (plurality opinion of White, J.).  
In contrast, Massachusetts contends, its law does not attempt to
impose limits after the completion of a contract.  Massachusetts is
technically correct that firms are free to engage in business with
Burma once their contracts with Massachusetts are completed.  But
this distinction is hollow: the Massachusetts law, by creating a
selective purchasing list, creates a mechanism to monitor the
ongoing activities of private actors.  This monitoring is not
limited to individual purchasing decisions.  Further, Massachusetts
is attempting to regulate unrelated activities of its contractors
once a contract is signed but before its performance is completed.  
Massachusetts also attempts to regulate unrelated activities of
anyone negotiating with the state or responding to a request for
bids.  Importantly, the Massachusetts Burma Law applies to conduct
not even remotely linked to Massachusetts.  It imposes restrictions
on markets other than the market for state procurement contracts.  
Under South-Central Timber, states may not use the market
participant exception to shield otherwise impermissible regulatory
behavior that goes beyond ordinary private market conduct.
 Massachusetts also argues that the effects of its law are
not relevant to the inquiry into whether it is acting as a
regulator.  Massachusetts notes that the Supreme Court has found
that states were acting as market participants even when they
pursued goals not directly linked to local economic well-being.  
Massachusetts is correct that in Alexandria Scrap the Supreme Court
permitted Maryland to act as a market participant to pursue
environmental concerns.  See Alexandria Scrap, 426 U.S. at 809,
814; see also L. Tribe, Constitutional Choices 144 (1985) (noting
that Alexandria Scrap and Reeves involved situations in which
states "intended their entrances [into the market] to affect the
flow of commerce so as to enhance public values" (emphasis in
original)).  Yet this is not enough to save a law that regulates
activity outside of Massachusetts that is not related to the
seller's interactions with Massachusetts.  As the Supreme Court has
explained, Alexandria Scrap, Reeves, and White stand for the
proposition that "under the dormant Commerce Clause, a State acting
in its proprietary capacity as a purchaser or seller may 'favor its
own citizens over others.'"  Camps Newfound/Owatonna, 520 U.S. at
592-93 (quoting Alexandria Scrap, 426 U.S. at 810).  But this
doctrine does not permit Massachusetts to pursue goals that are not
designed to favor its citizens or to secure local benefits.  Cf.
Air Transport Ass'n of Am. v. City and County of San Francisco, 992
F. Supp. 1149, 1163 (N.D. Cal. 1998).
 Massachusetts's action is also invalid under Wisconsin
Department of Industry, Labor and Human Relations v. Gould Inc.,
475 U.S. 282 (1986), in which the Supreme Court held that Wisconsin
was not acting as a market participant when it refused to purchase
products from repeated violators of the National Labor Relations
Act.  See id. at 289.  The Court found that "Wisconsin's debarment
scheme is tantamount to regulation," id., as the law could not
"even plausibly be defended as a legitimate response to state
procurement constraints or to local economic needs, or [as] a law
that pursues a task Congress intended to leave to the States," id.
at 291.  In Building & Construction Trades Council v. Associated
Builders & Contractors, 507 U.S. 218 (1993), the Court stated that
"Gould makes clear" that "[w]hen the State acts as regulator, it
performs a role that is characteristically a governmental rather
than a private role."  Id. at 229.
 Attempting to distinguish Gould, Massachusetts argues
that Gould was concerned primarily with the NLRA's preemption of
state law and that Gould involved punishment of companies for past
actions.  Massachusetts protests that under the Massachusetts Burma
Law the Commonwealth is imposing conditions on current activities
-- and thus companies can respond by changing their practices.  Cf.
Board of Trustees, 562 A.2d at 751 (distinguishing Gould).  Under
Gould and South-Central Timber, however, state regulations that go
beyond the scope of normal market participation are not immune from
Commerce Clause scrutiny.  Massachusetts's desire to eliminate
moral taint that it claims it suffers from dealing with firms that
do business in Burma does not permit it to act to regulate
activities beyond its borders.   
 Massachusetts contends that it acts as private actors do
because some companies have ceased doing business with Burma due to
human rights concerns.  The NFTC, in turn, argues that these
companies have not ceased doing business with other companies that
remain involved in Burma.  Even if certain companies ceased
purchasing goods from companies that maintain investments in Burma,
such a fact would not be sufficient to lead us to consider the
Massachusetts Burma Law to be market participation.  The proper
inquiry is whether Massachusetts is acting as an ordinary market
participant would act, not whether any participant has acted in
such a fashion.  Massachusetts has created a market, but it cannot
regulate the market that it has created so as to regulate conduct
elsewhere not related to that market.  As the NFTC noted at oral
argument, Massachusetts's action here is akin to prohibiting
purchases from companies that do business in states that have
policies with which Massachusetts disagrees.  This would plainly be
unconstitutional under the domestic Commerce Clause.  Massachusetts
surely cannot do the same in the international context, as state
actions that affect international commerce receive even greater
scrutiny than do actions that affect interstate commerce.  See
Japan Line, 441 U.S. at 448.
2.  It is Unlikely that the Market Participant Exception Applies to
   the Foreign Commerce Clause

 Our finding that Massachusetts is not acting as a market
participant means that the Massachusetts law must be subjected to
ordinary Foreign Commerce Clause analysis.  Yet there is likely an
additional reason that the Massachusetts law is not shielded from
Foreign Commerce Clause scrutiny: we are skeptical of whether the
market participation exception applies at all (or without a much
higher level of scrutiny) to the Foreign Commerce Clause.
  The Supreme Court has not resolved this issue.  In
Reeves, the Court commented that "[w]e have no occasion to explore
the limits imposed on state proprietary actions by the 'foreign
commerce' Clause" but added that such "scrutiny may well be more
rigorous when a restraint on foreign commerce is alleged."  Reeves,
447 U.S. at 437 n.9; see also South-Central Timber, 467 U.S. at 92
n.7 (expressing concern about the international ramifications of
Alaska's challenged timber policy).   
 Massachusetts's argument relies on the decisions in
Trojan Technologies, Inc., 916 F.2d at 912, Board of Trustees, 562
A.2d at 752-53, and K.S.B. Technical Sales Corp., 381 A.2d at 788.  
Cf. Tribe, American Constitutional Law  6-21, at 469 (2d ed. 1988)
(noting that while state laws banning private individuals or
companies from doing business with South Africa would be invalid
under Zschernig, "under the Supreme Court's market participant
exception to the commerce clause, a state would be free to
pass . . . rules requiring that purchases of goods and services by
and for the state government be made only from companies that have
divested themselves of South African commercial involvement"
(footnote omitted)).  Massachusetts urges us to follow Trojan
Technologies, Board of Trustees, and K.S.B. Technical Sales Corp.  
We decline to do so.   
 The Supreme Court has repeatedly suggested that state
regulations that touch on foreign commerce receive a greater degree
of scrutiny than do regulations that affect only domestic commerce.  
See South-Central Timber, 467 U.S. at 96; Reeves, 447 U.S. at 437
n.9; Japan Line, 441 U.S. at 448 (noting that "there is evidence
that the Founders intended the scope of the foreign commerce power
to be . . . greater" than that of the domestic commerce power).  
Contrary to the Third Circuit's view in Trojan Technologies, we
believe that the risks inherent in state regulation of foreign
commerce -- including the risk of retaliation against the nation as
a whole and the weakening of the federal government's ability to
speak with one voice in foreign affairs, see Japan Line, 441 U.S.
at 450-51 -- weigh against extending the market participation
exception to the Foreign Commerce Clause.  When it comes to state
actions that touch on foreign affairs, "[a] foreign government has
little inclination to discern whether a burdensome action taken by
a political subdivision of the United States was taken under a
proprietary or a regulatory guise," and "the potential for the
creation of friction between the United States and a foreign nation
is not lessened because the state acts as a proprietor instead of
a regulator."  K. Lewis, Dealing With South Africa: The
Constitutionality of State and Local Divestment Legislation, 61
Tul. L. Rev. 469, 485 (1987).  To extend the market participant
doctrine would be to ignore these additional risks that arise in
the foreign commerce context.  But the issues are complex and we
choose to leave their resolution to another day and another case.
3.  The Massachusetts Burma Law Violates the Foreign Commerce  
   Clause       

 Because the market participation exception does not
shield the Massachusetts Burma Law from Commerce Clause scrutiny,
we must turn to whether the law does indeed violate the Foreign
Commerce Clause.  "Absent a compelling justification . . . a State
may not advance its legitimate goals by means that facially
discriminate against foreign commerce."  Kraft Gen. Foods, Inc. v.
Iowa Dep't of Revenue & Fin., 505 U.S. 71, 81 (1992).  Like the
dormant domestic Commerce Clause, which has the "core purpose . .
. [of] prevent[ing] states and their political subdivisions from
promulgating protectionist policies," Houlton Citizens' Coalition
v. Town of Houlton, No. 98-1999, 1999 WL 228274, at *10 (1st Cir.
Apr. 22, 1999), the Foreign Commerce Clause restricts protectionist
policies, but it also restrains the states from excessive
interference in foreign affairs.
 The crucial inquiry in this case is whether the
Massachusetts Burma Law is facially discriminatory.  The NFTC does
not claim that the law is invalid as applied under the balancing
test set forth in Pike v. Bruce Church, Inc., 397 U.S. 137, 142
(1970).  
 Massachusetts puts forth two arguments to support its
claim that its law does not violate the Foreign Commerce Clause.  
First, Massachusetts contends that the law does not discriminate
between domestic and foreign companies.  Second, Massachusetts
argues that its law does not impair the federal government's
ability to speak with one voice regarding foreign commerce.  Under
standard Commerce Clause analysis, a statute that facially
discriminates against interstate or foreign commerce will, in most
cases, be found unconstitutional.  See, e.g., Oregon Waste Sys.,
Inc. v. Department of Envtl. Quality, 511 U.S. 93, 99 (1994) ("If
a restriction on commerce is discriminatory, it is virtually per se
invalid.  By contrast, nondiscriminatory regulations that have only
incidental effects on interstate commerce are valid unless 'the
burden imposed on such commerce is clearly excessive in relation to
the putative local benefits.'" (quoting Pike, 397 U.S. at 142)
(emphasis in original) (citation omitted)).  Even under that
analysis, we find that the law is discriminatory and violates the
Foreign Commerce Clause.  Although the law does not discriminate
against foreign companies, it does discriminate against foreign
commerce.  Also, the law impedes the federal government's ability
to speak with one voice in foreign affairs, and amounts to an
attempt to regulate conduct outside of Massachusetts and outside of
this country's borders.  For these three reasons, we hold that the
Massachusetts law violates the Foreign Commerce Clause.
   a.  The Massachusetts Burma Law Facially Discriminates
             Against Foreign Commerce

 Massachusetts first argues that its law does not actually
discriminate against foreign commerce, primarily because the law
does not distinguish between foreign and domestic companies.  
Massachusetts relies on Oregon Waste Systems and Kraft.  In Oregon
Waste Systems, the Supreme Court said that the domestic Commerce
Clause "has long been understood to have a 'negative' aspect that
denies the States the power unjustifiably to discriminate against
or burden the interstate flow of articles of commerce."  Oregon
Waste Sys., 511 U.S. at 98.  In Kraft, the Supreme Court
invalidated as facially discriminatory a state tax scheme that
treated dividends from foreign subsidiaries less favorably than
dividends from domestic subsidiaries.  See Kraft, 505 U.S. at 74-
77, 82.  Massachusetts contends that these cases support its
argument that a law must distinguish between foreign and domestic
producers in order to be held facially invalid.  That is not the
test.  Massachusetts also argues that the crucial factor in
determining whether a law discriminates is not whether the law
singles out a particular foreign state, but rather whether it
discriminates "in favor of in-state businesses."  Board of
Trustees, 562 A.2d at 754 n.56.  That is also not the test.   
 A law need not be designed to further local economic
interests in order to run afoul of the Commerce Clause.  The
Supreme Court has said, "[o]ur cases . . . indicate that where
discrimination is patent, as it is here, neither a widespread
advantage to in-state interests nor a widespread disadvantage to
out-of-state competitors need be shown."  New Energy Co. v.
Limbach, 486 U.S. 269, 276 (1988).  In Kraft, the Supreme Court
explicitly rejected the argument that local favoritism is crucial
to a finding that a law is facially discriminatory, stating that it
was "not persuaded . . . that such favoritism is an essential
element of a violation of the Foreign Commerce Clause. . . .  As
the absence of local benefit does not eliminate the international
implications of the discrimination, it cannot exempt such
discrimination from Commerce Clause prohibitions."  Kraft, 505 U.S.
at 79.   
 Nor does the law's applicability to both foreign and
domestic companies save it.  Supreme Court decisions under the
Foreign Commerce Clause have made it clear that state laws that are
designed to limit trade with a specific foreign nation are
precisely one type of law that the Foreign Commerce Clause is
designed to prevent.  In Container Corp., the Supreme Court stated
that state legislation that relates to foreign policy questions
violates the Foreign Commerce Clause "if it either implicates
foreign policy issues which must be left to the Federal Government
or violates a clear federal directive."  Container Corp., 463 U.S.
at 194 (emphasis in original); see also Japan Line, 441 U.S. at
448-49 (stating that "[f]oreign commerce is preeminently a matter
of national concern" and noting that "[t]he need for federal
uniformity is no less paramount in ascertaining the negative
implication of Congress' power to 'regulate Commerce with foreign
Nations' under the Commerce Clause").  "If state action touching
foreign commerce is to be allowed, it must be shown not to affect
national concerns to any significant degree, a far more difficult
task than in the case of interstate commerce."  Tribe, American
Constitutional Law  6-21, at 469.  Although the Court in Container
Corp. stated that a state law would not be held invalid if it had
only "foreign resonances," Container Corp., 463 U.S. at 194,
Massachusetts's law clearly has more than just foreign resonances.  
Indeed, a chief goal of the Massachusetts law is to affect business
decisions pertaining to a foreign nation.
 The Massachusetts Burma Law discriminates against two  
subsets of foreign commerce -- that involving companies or persons
organized or operating in Burma and that involving companies or
persons doing business with Burma.  The law is thus a direct
attempt to regulate the flow of foreign commerce.  Massachusetts's
arguments miss a crucial point.  When the Constitution speaks of
foreign commerce, it is not referring only to attempts to regulate
the conduct of foreign companies; it is also referring to attempts
to restrict the actions of American companies overseas.  Long-
standing Supreme Court precedent indicates that the Framers were
concerned with "discriminations favorable or adverse to commerce
with particular foreign nations [under] state laws."  Cooley v.
Board of Wardens, 53 U.S. (12 How.) 299, 317 (1851).
   b.  The Massachusetts Burma Law Interferes with the
             Ability of the Federal Government  
             to Speak with One Voice

 The NFTC's argument that the Massachusetts Burma Law
violates the Commerce Clause because it interferes with the federal
government's ability to speak with one voice is similar to, but
distinct from, the argument that the law violates the foreign
affairs power of the federal government.  Independent of any claim
under Zschernig, the Supreme Court decisions in Japan Line and
Container Corp. make clear that a state law can violate the dormant
Foreign Commerce Clause by impeding the federal government's
ability to "speak with one voice" in foreign affairs, because such
state action harms "federal uniformity in an area where federal
uniformity is essential."  Japan Line, 441 U.S. at 448-49; see also
Container Corp., 463 U.S. at 193.
 Massachusetts contends that Barclays "severely undercuts,
if not eliminates" the Commerce Clause "one voice" test.  
Massachusetts also argues that Barclays demonstrates that the one
voice test has never actually forbidden voices other than that of
the federal government, and that while the federal government has
the last word on foreign affairs -- and thus can preempt the
Massachusetts law -- it does not have the only word.
 Massachusetts misreads Barclays.  Rather than dismantling
the one voice test, Barclays applied this test.  The Court found,
however, that since Congress had effectively condoned the
challenged law, the Court could not conclude that the California
worldwide reporting requirement impeded the ability of the federal
government to speak with one voice.  See Barclays, 512 U.S. at 328-
30. Barclays reached this determination in light of repeated
congressional consideration of the precise issue at hand and in
light of the fact that the challenged law did not directly regulate
foreign commerce.  Nothing in Barclays suggests that we should
reduce the amount of scrutiny that a state law that directly
regulates foreign commerce should receive.
   c.  Massachusetts is Attempting to Regulate Conduct  
             Beyond Its Borders

 The Massachusetts Burma Law violates the Foreign Commerce
Clause for an additional reason: Massachusetts is attempting to
regulate conduct beyond its borders and beyond the borders of this
country.  In the domestic Commerce Clause arena, the Supreme Court
has held that "one State's power to impose burdens on the
interstate market . . . is not only subordinate to the federal
power over interstate commerce but is also constrained by the need
to respect the interests of other States," and that "it follows
from . . . principles of state sovereignty and comity that a State
may not impose economic sanctions on violators of its laws with the
intent of changing . . . lawful conduct in other States."  BMW of
N. Am., Inc. v. Gore, 517 U.S. 559, 571-72 (1996) (citation
omitted).  In Brown-Forman Distillers Corp. v. New York State
Liquor Authority, 476 U.S. 573 (1986), the Court invalidated a New
York law that required that wholesale prices of alcohol in New York
not exceed the lowest price at which the seller would sell the same
product in any other state.  See id. at 575-78.  The Court held
that the fact that the law was "addressed only to sales of liquor
in New York is irrelevant if the 'practical effect' of the law is
to control liquor prices in other States."  Id. at 583 (quoting
Southern Pac. Co. v. Arizona ex rel. Sullivan, 325 U.S. 761, 775
(1945)).  The Massachusetts statute does not meet even these
standards because both the intention and effect of the statute is
to change conduct beyond Massachusetts's borders.
 Massachusetts is in no better position because it seeks
in part to change conduct not only outside Massachusetts, but also
outside the United States.  Cf. Hostetter v. Idlewild Bon Voyage
Liquor Corp., 377 U.S. 324, 333-34 (1964) (equating state attempts
to control commerce flowing into foreign countries with attempts to
control commerce flowing into a federal enclave).  Massachusetts
may not regulate conduct wholly beyond its borders.  Yet the
Massachusetts Burma Law -- by conditioning state procurement
decisions on conduct that occurs in Burma -- does just that.  Cf.
Healy v. Beer Inst., 491 U.S. 324, 336 (1989) ("The Commerce Clause
. . . precludes the application of a state statute to commerce that
takes place wholly outside of the State's borders, whether or not
the commerce has effects within the State."  (alteration in
original) (quoting Edgar v. MITE Corp., 457 U.S. 624, 642-43 (1982)
(plurality opinion)) (internal quotation marks omitted)).  The
"critical inquiry" here is "whether the practical effect of the
regulation is to control conduct beyond the boundaries of the
State."  Healy, 491 U.S. at 336.  Because we find that the
Massachusetts Burma Law has such an effect, and is not otherwise
shielded by the market participant exception, we find that the law
violates the Foreign Commerce Clause.  
 Massachusetts cannot save its law by protesting that a
company doing business with Burma can simply forgo contracts with
Massachusetts, or simply beat the next highest bidder's price by
ten percent.  Every discriminatory state law can be avoided by
withdrawing from the enacting state.  In Healy, for example, liquor
distributors could have avoided the New York law by staying out of
the New York liquor market.  To allow state laws to stand on this
ground, however, would be to read the Commerce Clause out of the
Constitution.  Moreover, the relative influence of a state's
purchasing power cannot suffice to save discriminatory legislation.  
If a Massachusetts can enact a Burma law, so too can California or
Texas.  Finally, we have no reason to view a ten-percent bidding
penalty as anything other than an effective exclusion from the
bidding process.   
   d.  Massachusetts Has Failed to Put Forth a Legitimate  
             Local Justification in Support of its Law

 Given that the Massachusetts Burma Law discriminates on
its face against foreign commerce, it can survive Commerce Clause
scrutiny only if it is "demonstrably justified" because it
"advances a legitimate local purpose that cannot be adequately
served by reasonable nondiscriminatory alternatives."  New Energy
Co., 486 U.S. at 274, 278.  Massachusetts, having made its primary
arguments on other grounds, provides no support under either
domestic or Foreign Commerce Clause jurisprudence for the
proposition that a state's expression of moral concerns can provide
a valid basis for a discriminatory law.   Even if expression of
moral outrage about foreign human rights concerns were a valid
local purpose, Massachusetts would need to show that it has no less
discriminatory means of expressing its outrage.  It has not done
so, or even attempted to do so.
 The NFTC argues that the Supreme Court has made clear
that the only facially discriminatory laws that survive domestic
Commerce Clause scrutiny are laws designed to protect a state's
natural resources or the health and safety of its citizens.  Cf.
Maine v. Taylor, 477 U.S. 131, 151 (1986); Oregon Waste Sys., 511
U.S. at 101.  Regardless of any such limits in the Commerce Clause
context, as discussed above, Massachusetts's attempt to justify
this statute as falling within traditional areas of state concern
is unconvincing.  The Supreme Court has recognized a number of
disparate topics and fields of law as traditional areas of state
concern, but has not suggested that moral concerns regarding human
rights conditions abroad -- though effectuated via state
procurement policy -- are such an area.  The argument that there is
a local purpose that cannot otherwise be adequately served is very
weak and does not suffice.  
                               IV
 The NFTC contends that the Massachusetts Burma Law is
preempted by the Federal Burma Law, and thus violates the Supremacy
Clause.  Massachusetts contends both that Congress has implicitly
permitted the law and that, in any event, the federal sanctions do
not preempt the Massachusetts law.  We reject Massachusetts's claim
that Congress has permitted the law and find that Congress has
preempted the law.  
 The district court found that the NFTC "failed to carry
[its] burden" of showing "that Congress intended to exercise its
authority to set aside a state law."  National Foreign Trade
Council, 26 F. Supp. 2d at 293.  The district court rejected the
NFTC's claim that the Massachusetts law reflected a unilateral
approach to trade with Burma, one that conflicted with federal
law's endorsement of a multilateral strategy.  The court based this
finding on its determination that the federal statute "actually
provides for unilateral sanctions against [Burma]."  Id.  In so
doing, the district court misapprehended NFTC's burden and applied
an erroneous legal standard to the facts.
1.  Congress Has Not Implicitly Approved of or Permitted the
   Massachusetts Law

 Massachusetts attempts to preclude an inquiry into
whether its law is preempted by the Federal Burma Law by arguing
that Congress, fully aware of the Massachusetts law when it
considered federal sanctions against Burma, failed explicitly to
preempt the state law and thus impliedly permitted it.  
Massachusetts again relies on the Supreme Court's opinion in
Barclays, arguing that Congress's failure explicitly to preempt the
law shields the law from constitutional scrutiny.  We reject
Massachusetts's argument.
 As it had done in Container Corp., 463 U.S. at 196-97,
and  Wardair, 477 U.S. at 6-7, the Supreme Court in Barclays looked
for indicia that Congress had acted to preempt the state practices
in dispute.  Noting that Congress was fully aware of foreign
government opposition to state combined reporting requirements, see
Barclays, 512 U.S. at 324, that the Court itself had ruled
favorably to the state on the issue in a previous case, see id. at
321-22, and that Congress had "on many occasions studied state
taxation of multinational enterprises," id. at 324-25, including
consideration of proposed legislation that would have prohibited
California's reporting requirements, see id. at 325, the Court
stated that "Congress implicitly has permitted the States to use
the worldwide combined reporting method,"  id. at 326 (emphasis in
original); see also id. at 329 ("Congress has focused its attention
on this issue, but has refrained from exercising its authority to
prohibit state-mandated worldwide combined reporting.").  Barclays
made clear that determining "whether the national interest is best
served by tax uniformity, or state autonomy," was a decision best
left to Congress, not the courts.  Id. at 331; see also Container
Corp., 463 U.S. at 194 ("This Court has little competence in
determining precisely when foreign nations will be offended by
particular acts, and even less competence in deciding how to
balance a particular risk of retaliation against the sovereign
right of the United States as a whole to let the States tax as they
please.").  The posture of Congress here is nothing like the
position of Congress recounted in Barclays.
 Massachusetts notes that, in addition to failing to
indicate a desire to preempt in the Federal Burma Law, Congress has
debated the appropriateness of state and local actions concerning
Burma, but has not passed legislation explicitly preempting state
and local selective purchasing laws.  See 144 Cong. Rec. H7,277-
H7,285 (daily ed. Aug. 5, 1998).  Massachusetts's argument is
supported by amici curiae members of Congress in support of
reversal, who contend that "Congress is well aware of the criticism
being directed at the Massachusetts law and other state and local
purchasing measures," and who point to repeated testimony regarding
the issue before congressional subcommittees.  These amici curiae
also state that Congress's failure to address state and local
measures, either when it enacted the federal sanctions against
Burma or when it considered legislation reforming federal sanctions
law, see H.R. 2708, 105th Cong. (1997), was intentional.  
Massachusetts's argument is opposed by other amici curiae who are
also members of Congress, who say that the Massachusetts law
threatens to destroy the carefully crafted federal scheme of
sanctions against Burma, and who argue that Congress lacks the
ability to monitor the legislative activities of the fifty states
and thousands of municipalities in this country to determine
whether laws of such jurisdictions are harming the nation's foreign
policy.
 We do not believe that Barclays applies to the facts of
this case, for four reasons.  First, the discussion of preemption
in Barclays came as part of a Commerce Clause inquiry into whether
the challenged law impaired the federal government's ability to
speak with one voice.  The California law was not challenged under
the Supremacy Clause.  Barclays commented that "there is no claim
here that the federal tax statutes themselves provide the necessary
pre-emptive force."  Barclays, 512 U.S. at 321 (quoting Container
Corp., 463 U.S. at 196) (internal quotation marks omitted).  
Barclays thus did not discuss how courts should address Supremacy
Clause challenges to state laws that impact foreign affairs, such
as the Massachusetts Burma Law.
 Second, Barclays involved an area of traditional state
activity: taxation of companies which do business within the state
and elsewhere and the appropriate allocation to the state of such
companies' income.  The California law had few direct foreign
policy implications and was not structured so as to affect conduct
beyond the borders of the state.
 Third, the clarity and frequency in Barclays of the
refusal of Congress to act, despite a host of bills and a Supreme
Court decision, is vastly different than the situation we face in
this case.  In Barclays, Congress had been put on notice by the
Court's prior decision in Container Corp. and had considered
"numerous bills [that] . . . would have prohibited the California
reporting requirement."  Id. at 325.  In contrast, Congress never
formally voted on provisions that would have explicitly preempted
the Massachusetts law.  The Barclays discussion of implied
permission involved only a Commerce Clause inquiry into whether
state laws are preempted by the need for the nation to speak with
one voice in foreign affairs.  Massachusetts has given us no reason
to extend Barclays to the different facts we face here, and we
decline to do so.   
 Fourth, although Barclays involved congressional silence,
Congress has not been silent about Burma.  The real question is not
what to infer from congressional inaction, but how to interpret the
action that Congress has already taken in enacting sanctions
against Burma.
2.  The Massachusetts Burma Law is Preempted by Federal Sanctions  
   Against Burma                 

 We address the question of whether the Federal Burma Law
preempts Massachusetts's law by examining the usual indicia of
congressional intent where there is no express preemption
statement.  Congressional intent to preempt may be found where a
federal statute is so pervasive as to occupy the field, see Gade v.
National Solid Wastes Management Ass'n, 505 U.S. 88, 98 (1992),
where it would be physically impossible to comply with both the
federal and the state law, see Florida Lime & Avocado Growers, Inc.
v. Paul, 373 U.S. 132, 142-43 (1963), or where enforcement of the
state law "stands as an obstacle to the accomplishment and
execution of the full purposes and objectives of Congress," Hines,
312 U.S. at 67.
 If the subject matter of the law in question is an area
traditionally occupied by the states, congressional intent to
preempt must be "clear and manifest."  Rice v. Santa Fe Elevator
Corp., 331 U.S. 218, 230 (1947).  The district court, relying on a
domestic commerce clause case, stated that "[p]laintiff's burden is
particularly heavy."  National Foreign Trade Council, 26 F. Supp.
2d at 293.  This was error.
 Preemption will be more easily found where states
legislate in areas traditionally reserved to the federal
government, and in particular where state laws touch on foreign
affairs.  The test which should be applied is set forth in Hines.
 In Hines, the Supreme Court found that Pennsylvania's
Alien Registration Act was preempted by the federal Alien
Registration Act.  The Court stated that "[n]o state can add to or
take from the force and effect of [a] treaty or statute [regarding
aliens]."  Hines, 312 U.S. at 63.  The Court commented:
   [T]he regulation of aliens is so intimately blended and
 intertwined with responsibilities of the national
 government that where it acts, and the state also acts on
 the same subject, "the act of Congress, or the treaty, is
 supreme; and the law of the State, though enacted in the
 exercise of powers not controverted, must yield to it."  
 And where the federal government, in the exercise of its
 superior authority in this field, has enacted a complete
 scheme of regulation and has therein provided a standard
 for the registration of aliens, states cannot,  
 inconsistently with the purpose of Congress, conflict or
 interfere with, curtail or complement, the federal law,
 or enforce additional or auxiliary regulations.

Id. at 66-67 (quoting Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211
(1824)) (footnote omitted). Likewise, in Boyle v. United
Technologies Corp., 487 U.S. 500 (1988), the Court, considering the
liability of an independent contractor who had supplied a military
helicopter to the United States, commented that when considering
"an area of uniquely federal interest," a "conflict with federal
policy need not be as sharp as that which must exist for ordinary
pre-emption when Congress legislates 'in a field which the States
have traditionally occupied.'"  Id. at 507 (quoting Rice, 331 U.S.
at 230).
 Hines and its progeny establish that preemption is much
more easily found when Congress has passed legislation relating to
foreign affairs.  The Supreme Court has repeatedly cited Hines for
the proposition that an "Act of Congress may touch a field in which
the federal interest is so dominant that the federal system will be
assumed to preclude enforcement of state laws on the same subject."  
Maryland v. Louisiana, 451 U.S. 725, 746 (1981); Ray v. Atlantic
Richfield Co., 435 U.S. 151, 157 (1978); City of Burbank v.
Lockheed Air Terminal, Inc., 411 U.S. 624, 633 (1973); Rice, 331
U.S. at 230.  Other cases make the same point using similar
language.  See, e.g., Hillsborugh County, 471 U.S. at 713;
Pennsylvania v. Nelson, 350 U.S. 497, 504 (1956).
 The Supreme Court, distinguishing Hines in considering a
state labor law, explained:
    [In Hines] we were dealing with a problem which had an
    impact on the general field of foreign relations.  The
    delicacy of the issues which were posed alone raised
    grave questions as to the propriety of allowing a state
    system of regulation to function alongside of a federal
    system.  In that field, any "concurrent state power that
    may exist is restricted to the narrowest of limits."
    Therefore, we were more ready to conclude that a federal
    Act in a field that touched international relations
    superseded state regulation than we were in those cases
    where a State was exercising its historic powers over
    such traditionally local matters as public safety and
    order and the use of streets and highways.
Allen-Bradley Local No. 1111 v. Wisconsin Employment Relations Bd.,
315 U.S. 740, 749 (1942) (quoting Hines, 312 U.S. at 68) (citation
omitted).   
 Massachusetts argues that the ordinary clear statement
rule regarding congressional intent to preempt should apply because
state procurement is a traditional area of state power reserved to
the states by the Tenth Amendment.  Cf. Gregory v. Ashcroft, 501
U.S. 452, 460 (1991) ("[I]f Congress intends to alter the usual
constitutional balance between the States and the Federal
Government, it must make its intention to do so unmistakably clear
in the language of the statute."  (quoting Will v. Michigan Dep't
of State Police, 491 U.S. 58, 65 (1989)) (internal quotation marks
omitted)).  This argument is no more convincing here than it is in
the context of Massachusetts's claim that its Tenth Amendment
interests shield its law from scrutiny under Zschernig.  
Massachusetts argues that "state procurement is not an area of
unique federal interest" (internal quotation marks omitted), but
ignores the fact that its law, like the federal sanctions against
Burma, is aimed primarily at effecting change in and expressing
disapproval of the current regime in Burma.  Similarly, the fact
that Congress has at times explicitly preempted local sanctions,
see, e.g., 50 U.S.C. app.  2407(c) (West 1991) (stating that
federal provisions prohibiting United States persons from complying
with foreign boycotts against nations with which the United States
maintains friendly relations preempted state and local laws,
regulations, and rules), does not prevent our finding of preemption
where Congress has not spoken so directly.  To do otherwise would
be to ignore Hines.
     Massachusetts attempts to distinguish this case from
Hines by relying on De Canas v. Bica, 424 U.S. 351 (1976).  De
Canas concerned a California law forbidding employers from
"knowingly employ[ing] an alien who is not entitled to lawful
residence in the United States if such employment would have an
adverse effect on lawful resident workers."  Id. at 352 (quoting
Cal. Labor Code  2805(a)) (internal quotation marks omitted).  The
Supreme Court found that the Immigration and Nationality Act, while
a "comprehensive federal statutory scheme for regulation of
immigration and naturalization," nevertheless did not preempt the
California law.  Id. at 353-54.  To reach this conclusion, however,
the Court first assumed that the California statute "only applie[d]
to aliens who would not be permitted to work in the United States
under pertinent federal laws and regulations."  Id. at 353 n.2.  
Thus, the California law simply "adopt[ed] federal standards in
imposing criminal sanctions against state employers who knowingly
employ aliens who have no federal right to employment within the
country."  Id. at 355.
 In contrast, Massachusetts is attempting to regulate the
same conduct -- trade with Burma -- addressed by the Federal Burma
Law, but is doing so by imposing distinct restrictions different in
scope and kind from the federal law.  Some actions lawful under
federal law would be unlawful under the state statute.  The
Massachusetts law is therefore akin to a hypothetical California
statute prohibiting employment of any aliens, even those allowed to
work under federal law.  The De Canas Court considered, and
rejected, such laws.  See id. at 358 n.6.  California acted to
regulate employment, an area where states  "possess broad authority
under their police powers."  Id. at 356.  Massachusetts is not
acting under its traditional state police powers.
 Hines and its progeny mean that when Congress legislates
in an area of foreign relations, there is a strong presumption that
it intended to preempt the field, in particular where the federal
legislation does not touch on a traditional area of state concern.  
Under this standard we find that Congress has preempted the
Massachusetts Burma Law.  Congress has constructed a reasonably
comprehensive statute covering a field of foreign relations.  But
even if Congress had not been so comprehensive, the state law would
still conflict with the federal law.  "The basic subject of the
state and federal laws is identical," Hines, 312 U.S. at 61, but
Massachusetts's law veers from the carefully balanced path that
Congress has constructed.  Congress is attempting to balance
various concerns and is "trying to steer a middle path."  Id. at
73.  In enacting sanctions against Burma, Congress attempted to
strike at least two sorts of balances.  First, Congress sought to
improve human rights in Burma, but did so in the context of this
country's overall foreign relations, including, at the least, the
United States' experiences with human rights practices elsewhere,
this country's relationships with its trading partners, its
economic interests, and its interest in forming alliances rather
than taking unilateral actions.  Second, Congress considered
various mechanisms to accomplish and balance this country's various
interests and goals and chose a set of carefully calibrated tools.  
This careful calibration reflects the judgment of the Congress and
the President that the federal choice of tools is the most
effective means to improve human rights conditions in Burma while
safeguarding other national interests.  Massachusetts, in contrast,
has chosen a blunt instrument to further only a single goal, making
judgments different from and contrary to the judgments made by
Congress and the President.
 Congress considered and rejected barring all United
States investment in Burma, see S. 1092, 104th Cong. (1995),
instead choosing to limit only new investment in the "development
of resources."  In contrast, the Massachusetts law applies to
virtually all investment in Burma.  The Federal Burma Law permits
some trade with Burma, while the Massachusetts law does not.  For
example, the Federal Burma Law does not sanction companies for
merely having subsidiaries with operations in Burma, having been
organized in Burma, being a majority-owned franchise of a company
with Burma operations, or being a United States subsidiary or a
foreign company that engages in business in Burma.  The
Massachusetts law does.   
 The Massachusetts law thus regulates conduct not covered
by the federal law and applies to parties, including foreign
companies, not covered by the federal law.  As in Hines, the
Massachusetts law therefore has effects more inimical to foreign
interests than those of the federal law.  The Massachusetts law
penalizes the activities of foreign companies which are lawful
under the laws of those companies' home countries and are not
prohibited by trade agreements with the United States or by United
States federal law.  In addition, the federal law provides for
sanctions to be terminated upon a finding by the President that
human rights conditions in Burma have improved; the Massachusetts
Burma Law has no such provision.  In the Federal Burma Law,
Congress has chosen to rely on both carrots and sticks.  
Massachusetts uses a cudgel.  In doing so, Massachusetts risks
upsetting Congress's careful choice of tools and strategy.
 Additionally, Massachusetts's unilateral strategy toward
Burma directly contradicts the federal law's encouragement of a
multilateral strategy.  That the federal government has itself at
times acted unilaterally in its approach to Burma, or has created
a mechanism that allows the President to fine-tune the federal
government's approach, does not eliminate the fact that
Massachusetts's unilateral sanctions are inconsistent with the
federal regime.  Cf. 142 Cong. Rec. S8753 (daily ed. July 25, 1996)
(stating that the United States "maintain[s] a range of unilateral
sanctions [against] Burma").  The Massachusetts law directly
conflicts with Congress's instruction that the federal government
pursue a multilateral strategy with regard to Burma.  It is of
little importance that some companies can comply with both federal
and state laws regarding Burma.  Massachusetts's argument to this
effect resembles the argument made by the three dissenters in
Hines, see Hines, 312 U.S. at 81 (Stone, J., dissenting), an
argument that the Hines majority implicitly rejected, see Hines,
312 U.S. at 68 (majority opinion) ("Any concurrent state power that
may exist is restricted to the narrowest of limits; the state's
power here is not bottomed on the same broad base as is its power
to tax.").  Finally, the fact that Congress may have been aware of
the Massachusetts law at the time it passed the Federal Burma Law
does not lead to a different outcome.  In Hines, nineteen states
had passed alien registration laws prior to Congress's passage of
the federal law, see id., at 79 (Stone, J., dissenting), yet the
Supreme Court nevertheless did not conclude from earlier
congressional inaction that these laws were not preempted.
 Massachusetts protests that the goals of its statute --
promoting change in Burma and expressing disapproval of conditions
in Burma -- are the same as those of the federal legislation, and
thus that there can be no conflict between the Massachusetts law
and federal sanctions.  Yet the fact that state and federal
legislation share common goals, either in whole or in part, is not
sufficient to preclude a finding of preemption.  See Gade, 505 U.S.
at 103.  The crucial inquiry is whether a state law impedes the
federal effort.  See Gould, 475 U.S. at 286; International Paper
Co. v. Ouellette, 479 U.S. 481, 494 (1987).  Where, as here, the
federal government has acted in an area of unique federal concern
and has crafted a balanced, tailored approach to an issue, and the
state law threatens to upset that balance, the state law is
preempted.  Under the Supremacy Clause, the Massachusetts Burma Law
is unconstitutional.  Cf. Missouri v. Holland, 252 U.S. 416 (1920).
                               V
 The passage of the Massachusetts Burma Law has resulted
in significant attention being brought to the Burmese government's
human rights record.  Indeed, it may be that the Massachusetts law
was a catalyst for federal sanctions.  Massachusetts also played a
role, through its representatives in the House and the Senate, in
Congress's decision to impose sanctions on Burma.  Nonetheless, the
conduct of this nation's foreign affairs cannot be effectively
managed on behalf of all of the nation's citizens if each of the
many state and local governments pursues its own foreign policy.  
Absent express congressional authorization, Massachusetts cannot
set the nation's foreign policy.  
 The judgment of the district court is affirmed.

</body>

</html>